BREEZY POINT AIRPORT, INC. v. FIRST FEDERAL SAVINGS
AND LOAN ASSOCIATION OF BRAINERD, MINNESOTA.
IN RE PETITION FOR ORDER DIRECTING
ENTRY OF NEW CERTIFICATE.

179 N. W. (2d) 612.

September 4, 1970—No. 41958.

*Ryan, Ryan & Ebert* and *C. A. Ryan,* for appellant.
*Nolan, Alderman, Holden & Breen,* for respondent.

Heard before Knutson, C. J., and Rogosheske, Sheran, Peterson, and Frank T. Gallagher, JJ.

PER CURIAM.

Appeal from a judgment entered in two proceedings consolidated for hearing and decision before the trial court. The first is an action based on fraud brought by plaintiff, Breezy Point Airport, Inc., against the defendant, First Federal Savings and Loan Association of Brainerd, Minnesota (First Federal), seeking to compel defendant to convey certain land to plaintiff or, in the alternative, to pay damages. The second is a petition brought by defendant seeking the issuance of new Torrens certificates in its name for the same land. The trial court held in favor of defendant, finding no actionable fraud and directing the issuance of the title certificates in defendant's name.

The decisive issue presented is whether the evidence is sufficient to sustain the court's finding that defendant was not guilty of fraud. We hold that it is.

Briefly stated, the facts follow. In May 1965, a partnership known as Breezy Point Estates owned, among other properties, a filling station and airstrip near Pelican Lake in Crow Wing County. Don Eastvold

was principal managing partner. Sometime in May 1965, Mr. and Mrs. Leonard Johnson and Stirling Eastvold, Don Eastvold's cousin, were informed by Don Eastvold that the filling station and airstrip were available for purchase. After Stirling Eastvold interested Avery Sahl in joining in the purchase of the property, a meeting was scheduled with Don Eastvold for May 29, 1965, at Breezy Point. None of the prospective purchasers resided in the Breezy Point area. At the May 29th meeting, Sahl, Johnson, Mrs. Johnson, Stirling Eastvold, Don Eastvold, and William Graham, president of First Federal, were all present. At the time of this meeting the property under discussion was subject to a blanket mortgage held by First Federal of which the prospective purchasers were unaware.

Although the evidence permits the drawing of conflicting inferences and conclusions on the issue of fraud, it is undisputed that the subject of the status of title to the tracts of land never came up while Graham was present, nor was he ever asked by anyone during the negotiations about the status of title or the existence of a mortgage. Graham testified that he was at Breezy Point the morning of the meeting because Don Eastvold had told him he had a prospect (the Johnsons) for a tract of residential property and Graham might be needed to negotiate a loan to the purchaser. Graham left the meeting two to four hours before the purchase and sale of the filling station and airport property was made later that day. Sahl, Johnson, and Stirling Eastvold bought the property on a contract for deed on behalf of a corporation to be formed by them. Plaintiff corporation, Breezy Point Airport, Inc., was subsequently formed and assumed the buyers' interest in the property. The buyers first learned of the existence of the mortgage on July 20, 1965, through a letter written by Don Eastvold pursuant to the buyers' request that Don Eastvold agree to eliminate the airport property from the contract and reduce the contract price. It should be noted that after learning of the existence of the mortgage, the buyers neither sought rescission of the contract and return of their money nor did they attempt to compel either Don Eastvold or Breezy Point Estates to apply the money already paid on the contract against the mortgage so that a partial release of the mortgage could be obtained. Furthermore, with full knowledge of the existence of the mortgage, the buyers paid to Breezy Point Estates $3,000, the balance due on the contract price as adjusted to reflect the elimination of the airport tract from the contract. Additionally, the court could find that, as Stirling Eastvold tesified, it was not Mr. Graham's conduct which induced them to act, but rather their reliance on "cousin Don," and that it was not any fraud on defendant's part but

Don Eastvold's election to pocket the proceeds of sale, rather than to apply them against the mortgage, that caused plaintiff's damage. On October 8, 1965, the mortgage foreclosure was instituted and at the sale which was held on December 31, 1965, defendant purchased all of the property covered by the mortgage. On July 26, 1967, almost two years after the alleged fraud, plaintiff commenced this action seeking to compel defendant to convey the filling station property, or, in the alternative, to recover $43,000 damages. The action is based essentially upon plaintiff's allegations that defendant fraudulently concealed the existence of the mortgage from plaintiff, thereby causing its loss of the property and damage. Plaintiff makes no claim that Graham told the prospective purchasers that there was no mortgage, nor does it claim that Don Eastvold should have told them about the mortgage. Rather, plaintiff's sole claim is that Graham should have told the prospective purchasers about the existence of the mortgage without ever being asked. As to plaintiff's claim of fraud, the trial court found:

"That as it relates to plaintiff's purchase as described herein, and defendant's mortgage as described herein, defendant, its officers and employees, neither made representations, or was silent as to material facts which had to do with untruths, or which were made or withheld recklessly, nor did defendant represent or withhold information relating thereto with intention to deceive plaintiff and plaintiff did not rely on defendant, its officers and employees statements or withholding thereof and plaintiff was not induced to act thereon to its damage."

In an attached memorandum, the trial court explained:

"The plaintiffs have not sustained their burden of proof by a fair preponderance of the evidence as to any actionable fraud, the weight of the evidence being the other way and indicates to the Court that defendant was not a party to the transaction, or a participating third party and further does not satisfactorily show that plaintiffs relied upon defendant so as to create any duty on the part of such defendant."

While the evidence presented on the issue of whether or not defendant, acting through Mr. Graham, was guilty of fraud by silence is such that the trial court could have found either way, the evidence is more than sufficient, indeed compelling, to support the court's finding that plaintiff's incorporators were not induced to act by reason of any conduct on the part of Mr. Graham. It is elementary that absent the essential element of reliance, an action for fraud must fail. Love v. Anderson, 240 Minn. 312, 61 N. W. (2d) 419.

As has been noted above, on October 8, 1965, defendant commenced foreclosure of the mortgage which covered, among other properties, the filling station property, and on December 31, 1965, purchased the property at a sheriff's sale. No redemption was made within 1 year from the date of that sale. On December 6, 1967, defendant petitioned the district court for the issuance of new title certificates in its name. It was stipulated by the parties that all the mortgaged premises were sold in bulk without offering the service station property for sale separately and that no notice of lis pendens relating to the foreclosure was ever filed. Plaintiff claims that since Minn. St. 580.08 provides in essence that if mortgaged premises consist of separate and distinct tracts, they shall be sold separately, it was error not to offer the filling station property for sale separately because it constituted a separate tract. Plaintiff further contends that because Minn. St. 508.57 requires that "a notice of the pendency of the suit or proceeding to enforce or foreclose the mortgage * * * shall be filed with the registrar, and a memorial thereof entered on the register at the time or prior to the commencement of such action or proceeding," it was error not to file a notice of lis pendens in the mortgage foreclosure. As a result of these two errors, plaintiff contends that the mortgage foreclosure is invalid. The trial court found, however, that the two claimed defects were cured by L. 1967, c. 561, a curative act of a type usually enacted at each legislative session. Section 1 of this act provides that every mortgage foreclosure sale by advertisement in Minnesota before May 1, 1966, is made valid as against the following objections:

"(4)    That distinct and separate parcels of land were sold together as one parcel and to one bidder for one bid for the whole as one parcel.

\* \* \* \* \*

"(13)   That no notice of the pendency of the proceedings to enforce or foreclose the mortgage as provided in Minnesota Statutes, Section 508.57, was filed with the registrar of titles and a memorial thereof entered on the register at the time of or prior to the commencement of such proceeding; or failed to state in notice of foreclosure the fact of registration."

The act also provides:

"Sec. 3.   The provisions of this act shall not affect any action or proceeding now pending or which shall be commenced within six months after the passage hereof, in any of the courts of the state involving the validity of such foreclosure."

538

Although apparently agreeing that if L. 1967, c. 561, applies, the defects are cured, plaintiff contends that since § 3 of the act provides that it does not apply to actions involving the validity of a mortgage commenced within 6 months of May 18, 1967, the date of its passage, the act does not apply and the defects make the foreclosure invalid. The basis for this claim is plaintiff's contention that its fraud action commenced on July 26, 1967, involved the validity of the mortgage foreclosure. We fail to see how plaintiff's action for fraud involved the validity of the mortgage foreclosure. Its complaint alleges in essence that defendant's fraudulent failure to disclose the existence of the mortgage caused plaintiff damage. It nowhere raises the issue of the validity of the foreclosure procedure; in fact, to the contrary, it seems to assume that foreclosure was valid, for the damages claimed were caused by the foreclosure of the mortgage about which plaintiff claims defendant was fraudulently silent. Plaintiff first challenged the validity of the foreclosure in its answer to defendant's petition for issuance of new title certificates, a proceeding which was not commenced until December 8, 1967.

Since the irregularities in defendant's foreclosure procedure are precisely covered by L. 1967, c. 561, and since the validity of the mortgage foreclosure was not challenged until December 1967, we agree with the trial court's determination that the alleged defects were cured.

Affirmed.

Mr. Justice Kelly, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.