**NORTHWEST RACQUET SWIM AND HEALTH CLUBS, INC.,** Petitioner, Appellant,

v.

**DELOITTE & TOUCHE, f/k/a Touche Ross and Company,** Respondent.

No. C9–94–301.

Supreme Court of Minnesota.

Aug. 4, 1995.

Kay Nord Hunt, Philip A. Cole, James M. Lockhart, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for appellant.

Charles W. Quaintance, Jr., Lawrence M. Shapiro, Wayne S. Moskowitz, Brenda J. Arndt, Maslon, Edelman, Borman & Brand, Minneapolis, for respondent.

## OPINION

KEITH, Chief Justice.

This case arises from the purchase by appellant Northwest Racquet Swim and Health Clubs, Inc. ("Northwest") of $15 million in subordinated debentures from the now insolvent Midwest Federal Savings & Loan Association ("Midwest"). Respondent Deloitte & Touche ("Touche") performed audit work for Midwest for several years prior to the debenture transaction. At the trial court, Northwest alleged that Touche participated in a plan with Midwest that resulted in material misstatements in Midwest's 1986 year-end audited financial statements, on which Northwest relied in deciding to make the debenture purchase from Midwest. In support of its motion for summary judgment,

Touche made four arguments: 1) that Touche is entitled to summary judgment because Northwest's claims against Touche are derivative and therefore barred as a matter of law; 2) that Touche is entitled to summary judgment because no genuine issue of material fact exists as to whether Northwest actually and justifiably relied on Touche's alleged misrepresentations; 3) that Touche is entitled to summary judgment because no genuine issue of material fact exists as to whether Midwest's criminal conduct acted as a superseding cause of Northwest's losses; and 4) that Touche is entitled to summary judgment on Northwest's negligent misrepresentation claim because Touche owed no duty of care to Northwest. The trial court denied Touche's motion for summary judgment on all issues. After granting discretionary review, the court of appeals reversed on the basis of its conclusion that Northwest's claims are derivative and did not reach the other issues. *Northwest Racquet Swim and Health Clubs, Inc. v. Deloitte & Touche,* No. C9-94-301, 1994 WL 481345 (Minn.App. Sept. 6, 1994). In the appeal to this court, the sole issue properly raised is whether Northwest's claims are derivative.[1] We reverse the court of appeals and reinstate the decision of the trial court.

Northwest is a closely-held corporation with its principal place of business in St. Louis Park, Minnesota. Harvey Ratner and Marvin Wolfenson make all business decisions for the company, and shares of the corporation are held by members of the Ratner and Wolfenson families.

Until 1989, when it was placed in receivership, Midwest was a federally-chartered savings and loan association operating in Minnesota. Northwest and Midwest maintained a very close business relationship from approximately the mid–1950's until 1987. Green Tree Acceptance, Inc. ("Green Tree") was established by Midwest in 1976 as a wholly-owned subsidiary in the business of purchasing, pooling, and servicing loans for mobile homes and recreational vehicles.

---

1. The remaining issues argued by the parties at the time of summary judgment and addressed by the briefs to this court were not raised in Northwest's petition for review of the decision of the court of appeals and were not raised by Touche in a conditional petition for review. We therefore decline to address these additional issues.

Respondent Touche is a certified public accounting firm with offices in Minnesota. At the time of the transactions at issue in this case, Touche served as the certified public accountant for both Midwest and Green Tree and performed several year-end audits for both entities. Touche has never done audit work directly for Northwest, Ratner, or Wolfenson.

In May or June 1985, Midwest purchased from Green Tree the servicing rights and the net finance income receivable ("FIR") for approximately 88,000 mobile home loans. In the belief that the FIR would generate a significant income stream, Midwest paid Green Tree $188 million for the purchase.[2] Green Tree continued to service the loans, but it sent Midwest the payments received along with accounting data.

Touche's involvement with the FIR purchase was through its contact as auditor for both Green Tree and Midwest. In this capacity, Touche recommended and advocated the idea of Midwest's purchase of servicing rights from Green Tree, explained the transaction to both entities, and conducted a number of investigations involving the FIR in connection with its audit work.

By the fall of 1986, Touche became aware that the FIR was not providing the originally anticipated yield. In March or April 1987, Randall Cochrane, a partner at Touche, became concerned that the FIR's service reserve was insufficient to cover potential losses, and he notified Midwest that the FIR was not performing as expected. A Touche auditor was appointed specifically to do audit work on the FIR. Further, in April or May 1987, Midwest determined that Green Tree may have misrepresented the FIR value, resulting in an inflated purchase price paid by Midwest, and it reported this fact to Cochrane.[3] According to information available at that time, Midwest estimated that the FIR would generate approximately $47 million less than initially anticipated.

Although the record indicates that some miscalculations of anticipated losses on the FIR were made, it is disputed whether the errors resulted from Touche's work or from Green Tree and/or Midwest's insistence on particular initial assumptions relating to the FIR performance. Regardless, by the time Touche was to issue its audit report for the 1986 year, the estimated repayment and repossession rate had jumped from the initially estimated 2% to an actual rate for 1986 of 17%. This resulted in higher credit losses than expected, and the entire FIR loss reserve was exhausted.

Although the extent and the adequacy of Touche's investigation into the FIR shortfall are disputed in the record, Touche representatives took part in a series of meetings and discussions in an attempt to resolve the FIR problems. On May 30, 1987, Midwest executives met with Touche and Green Tree representatives in an attempt to resolve the $47 million shortfall so that Touche could issue its 1986 audit report by its June 1 deadline. On the belief that Midwest and Green Tree had resolved the issue, Touche issued the report in the first week of June, 1987.[4] The report listed the value of the FIR at roughly $190 million—a $4 million increase in value from 1985.

In fall 1987, Touche learned of an additional $16 or $17 million discrepancy relating to the FIR. Although the parties dispute the impact on the value of the FIR, the record shows that by December 1987, Midwest also became aware that the $47 million FIR shortfall had grown to an approximately $63 million deficit for Midwest.

In November 1987, Midwest filed an application with the Federal Home Loan Bank Board ("FHLBB") for approval to include

---

**2.** In several instances, the record indicates that Midwest actually paid $192 million, possibly due to tax consequences of the sale.

**3.** Northwest suggests that because Touche valued the FIR on Green Tree's books at $142 million but approved of the sale to Midwest at $188 million, it was aware of the overvaluation as early as the time of the 1985 sale.

**4.** As part of the resolution of the discrepancy, Midwest and Green Tree agreed to reduce Midwest's service fee on the loans from $6.00 per month to $.76 per month per loan. Midwest then absorbed this $48,000,000 primarily through a reduction in the future service cost reserve and a charge to the future income stream of the FIR.

$25 million of subordinated debt securities ("debentures") in its regulatory capital. Although the approval was not required before Midwest could issue the debentures, it was made a condition precedent to some of the sale agreements, and Midwest waited for approval before issuing the debentures. The parties are in dispute, and the record conflicts, as to whether Touche was aware that Midwest was applying to the FHLBB or whether Touche knew Midwest intended to use Touche's 1986 audit report for issuance of debentures. Regardless, the record demonstrates that Midwest requested 40 additional copies of the 1986 audit report from Touche in October and November of 1987, and the report was included in the application. At the time of the application, Midwest did not notify the FHLBB examiners of the problems with the FIR. The record further indicates that examiners at the FHLBB relied on the value of the FIR reported in Midwest's application in deciding whether to approve it, and the FHLBB relied on Touche's 1986 audit report as reflecting an accurate statement of the financial condition of Midwest. On December 21, 1987, the FHLBB approved the application. It is not clear from the record whether the application would have been denied had it accurately disclosed Midwest's financial condition.

In late summer and fall 1987, Northwest entered into discussions with Midwest to refinance several existing mortgages. At some point after he verbally agreed that Midwest would provide Northwest's requested financing, but possibly prior to the closing of these deals, Midwest's CEO, Harold Greenwood, Jr., approached Wolfenson and asked if Northwest would be willing to purchase $15 million in eight-year subordinated debentures from Midwest with some of the proceeds of the refinancing deals. Although he initially was reluctant to consider such a purchase, Wolfenson agreed he would speak with Ratner. After a follow-up conversation with Midwest officer Richard Nelson in which Wolfenson was told that the debentures could be used as collateral for loans with other lenders, Wolfenson's interest in the purchase heightened.

Shortly following these conversations, Midwest provided Wolfenson with a draft copy of the debenture agreement along with certain financial statements for Midwest. The draft agreement made approval by the FHLBB a condition precedent to the closing. The agreement stated that attached to it were Midwest's audited financial statements for the years 1984, 1985 and 1986. It also stated:

> All audited financial statements were prepared in accordance with regulatory accounting principles. Such balance sheets fairly present the financial condition of the Association as of the respective dates indicated and such statements of operations fairly present the results of the operations of the Association for the respective periods indicated.

The draft agreement also indicated that the financial statements contained no misrepresentations.

The 1986 audit report attached to the draft agreement was prepared by Touche and indicated that as of December 31, 1986, Midwest had retained earnings of $116,140,000. The notes to the consolidated financial statements stated in part:

> Regulatory accounting principles:
>
> The Association has in previous years accounted for gains and losses on the sale of certain mortgage assets and securities by deferring such gains and losses over the estimated contractual maturity of such assets and securities as permitted by the Federal Home Loan Bank Board under regulatory accounting principles (RAP) accounting. Generally accepted accounting principles (GAAP) would require immediate recognition of such gains and losses. Also, under RAP accounting, the Association includes eligible subordinated debentures as part of its regulatory capital. Under GAAP accounting, these debentures would be classified as a liability.

The audit report contained a reconciliation of net earnings and retained earnings from a RAP to a GAAP basis, and this reconciliation indicated that although 1986 retained earnings were $116,140,000 on a RAP basis, they were a negative $41,922,000 when adjusted to a GAAP basis. Moreover, the 1986 audit

report contained an accountant's report prepared by Touche and dated May 15, 1987. The report highlighted the fact that the audit was based on RAP accounting and further stated:

> These practices differ in some respects from generally accepted accounting principles. Accordingly, the accompanying financial statements are not intended to present financial position and results of operations in conformity with generally accepted accounting principles. This report is intended solely for filing with regulatory agencies and is not intended for any other purpose.

It is undisputed in the record that Wolfenson did not read the draft debenture agreement and financial statements provided by Midwest prior to Northwest's debenture purchase. Instead, Wolfenson left the financial statement examination to Ratner, as was the custom in their prior dealings. Ratner's deposition testimony indicates that, although he looked over the materials, he only briefly read the securities agreement, and he did not read the opinion of legal counsel, the notes to the financial statements, or the accountant's report. Primarily, Ratner looked at the consolidated balance sheets and the statement of earnings, and he considered retained earnings and profit as his main concerns. Ratner read the 1986 figure of $116 million in retained earnings and considered this a positive sign that the company had a sufficient reserve for future losses. Moreover, Ratner noted that the accountant's report was prepared by "Touche Ross & Company, Certified Public Accountants, and recognized that they were reputable, so that was good enough for me." After skimming through the financial statements for approximately 20 to 30 minutes, Ratner contacted Midwest officers Richard Nelson and Carl Storbakken to ask about the financial condition of Midwest. According to Ratner, Nelson told him that although Midwest had had some problems in the past, it was going well now. Storbakken corroborated Nelson's opinion.

Ratner's deposition testimony further indicates that, at some point in his review of the financial information, he detected that Touche's audit was done on a RAP basis rather than a GAAP basis, but he did not read the audit's description of the difference between the two accounting methods. Instead, he asked Nelson for an explanation at the same time they spoke about Midwest's financial condition. According to Ratner, Nelson explained that under RAP, Midwest was permitted by the "regulatory body" to write off certain loan losses over the balance of the loans rather than writing them off all in one year. Based on this information, Ratner "took the position that if it was accounting permitted by the regulatory body, meaning that governmental agency, it was good enough for them, and certainly I would accept that as an acceptable method of accounting." Ratner did not realize that on a GAAP basis, Midwest had negative retained earnings.

On December 10, 1987, Midwest loaned Northwest $49 million, part of which it used to pay off a previous mortgage. Thereafter, Northwest and Midwest entered into an additional $51 million refinancing package that included four separate loans. At some point after the closing of the $49 million deal, Northwest agreed to purchase the $15 million debenture from Midwest at 11.5% with an eight-year maturity period. On December 29, 1987, the parties executed a Subordinated Debt Security Agreement and Note detailing the terms. Ratner's and Wolfenson's later deposition testimony indicated that had they realized the true financial condition of Midwest at the time of the purchase, including the fact that it had no retained earnings on a GAAP basis, Northwest would not have made the purchase. Ratner and Wolfenson also stated that they relied on a combination of factors in making the purchase decision, including representations by Greenwood, Nelson and Storbakken at Midwest, on Touche's audited financial statements, and on the FHLBB's approval of the debenture issue.

In May 1988, Midwest notified the FHLBB that the value of the FIR had been overstated by $30 to $50 million. On February 13, 1989, Midwest was declared insolvent and was placed in conservatorship by the FHLBB. Midwest subsequently defaulted on the interest payments to Northwest on

the debenture. On April 27, 1989, Midwest announced it had understated its losses for 1988 and prior years by $247 million and that it was insolvent. On May 4, 1989, the Federal Savings and Loan Insurance Corporation was appointed Midwest's receiver.

During 1990, Greenwood and other officers of Midwest were indicted for a number of federal crimes, including conspiracy, mail fraud, securities fraud, and concealment and covering up by scheme and device. These criminal charges related to, among other things, the sale of debentures by Midwest to Northwest and other customers. Greenwood and several others were convicted on a majority of the counts, and Midwest's former chief financial officer pleaded guilty to conspiracy, mail fraud and securities fraud. In later depositions, both Ratner and Wolfenson stated that no one could foresee the criminal activity of Midwest's officers, and that they would not have dealt with Midwest had they been aware of it.

■ The primary issue raised in this appeal is whether the trial court erred in concluding as a matter of law that Northwest's claims against Touche are nonderivative.

■ Minnesota has long adhered to the general principle that an individual shareholder may not assert a cause of action that belongs to the corporation. *See Singer v. Allied Factors, Inc.,* 216 Minn. 443, 13 N.W.2d 378 (1944); *Seitz v. Michel,* 148 Minn. 474, 181 N.W. 106 (1921); *Mealey v. Nickerson,* 44 Minn. 430, 46 N.W. 911 (1890). Generally speaking, in such a case, redress must be sought in a "derivative" action on behalf of the corporation rather than in a direct action by the individual shareholder. *See* 12B Charles R.P. Keating & Jim Perkowitz–Solheim, Fletcher Cyclopedia of the Law of Private Corporations § 5908 (perm.

ed. rev. vol. 1993). This principle has also been applied to subordinated debenture holders and other creditors. *See National City Bank v. Coopers & Lybrand,* 409 N.W.2d 862 (Minn.App.1987), *pet. for rev. denied* (Minn. Oct. 21, 1987).

■ Although Northwest cites standards announced in other jurisdictions, this court has previously suggested that the method in Minnesota for distinguishing between a direct and a derivative claim is to consider whether the injury to the individual plaintiff is separate and distinct from the injury to other persons in a similar situation as the plaintiff. *See Seitz,* 148 Minn. at 476, 181 N.W. at 106. For example, in *Seitz,* the court considered a stockholder's claim that a third party conspired with corporate officers to "freeze-out" the stockholder from participation in the management of the corporation. 148 Minn. at 475, 181 N.W. at 106. The court noted:

> The conspiracy may have been directed against the plaintiff, and the defendants may be liable for the acts with which they are charged, but their acts resulted ultimately in the dissipation of corporate funds. *Plaintiff is injured just as all other stockholders are injured when the officers of a corporation waste or misapply its money.* If he has no individual right of action against an officer for misappropriating the money of the corporation, he has none against third persons who persuaded the officer to misappropriate it, and this without regard to the motives which actuated such third persons.

148 Minn. at 476, 181 N.W. at 106 (emphasis added). More recently, the United States Court of Appeals for the Eighth Circuit has addressed the issue and has applied this principle from *Seitz. See Arent v. Distribution Sciences, Inc.,* 975 F.2d 1370, 1372–73 (8th Cir.1992).[5]

5. In *Arent v. Distribution Sciences, Inc.,* the Eighth Circuit considered whether the claims brought by a corporation's minority shareholders against a third party that had entered into a merger agreement with the corporation were derivative. 975 F.2d 1370, 1372 (8th Cir.1992). According to the shareholders, the third party induced them through fraud, misrepresentation, and duress to buy or hold stock in the corpora-

tion. *Id.* In analyzing the shareholders' claims, the court noted that "[a] well-recognized method for determining whether a claim belongs to the corporation, rather than its shareholders, is to inquire whether '[t]he injury to each stockholder is of the same character.'" *Id.* (citing *Seitz v. Michel,* 148 Minn. 80, 87–88, 181 N.W. 102, 105 (1921)). The court held that because the plaintiffs did not allege any injury different from other

In the present case, then, the question before the court is whether Northwest has asserted any injury separate and distinct from the injury to other debenture holders. We believe it has.

For guidance on this issue, we look to a series of federal cases addressing claims similar to those asserted by Northwest.[6]

In *In re Sunrise Sec. Litig.*, 916 F.2d 874 (3d Cir.1990), a group of depositors sought to assert individual RICO claims against the directors, officers, auditors, and outside counsel of an insolvent savings and loan association arising out of the defendants' alleged misrepresentations of the true financial condition of the institution. *Id.* at 875, 882. Granting summary judgment to the defendants, the district court found that to the extent the plaintiffs alleged that the defendants' conduct caused the demise of the savings and loan or that the defendants misrepresented the injury they caused to the savings and loan, the plaintiffs asserted a derivative claim that could not be asserted individually. *Id.* at 876. On appeal, the United States Court of Appeals for the Third Circuit held that the plaintiffs' entire claim was derivative and affirmed the summary judgment. *Id.* The court held that despite the way the plaintiffs characterized their claims, their damages could not be separated from the injury sustained by the institution and by depositors generally. *Id.* at 887. Therefore the court held the plaintiffs' RICO claims were derivative and could not be brought as an individual action. *Id.* at 887–89.

Following this decision, the Third Circuit addressed the same issue in *University of Md. v. Peat Marwick Main & Co.*, 923 F.2d 265 (3d Cir.1991). In that case, policyholders of an insolvent insurance company sued the company's independent auditor for damages arising from the auditor's alleged false and misleading certification of the company's financial statements. *Id.* at 267. According to the plaintiffs, these financial statements induced them into remaining as policyholders with the company. *Id.* On appeal, the Third Circuit held that the plaintiffs' allegations constituted a direct rather than a derivative injury. *Id.* at 274. The court distinguished the case before it from *In re Sunrise Sec. Litig.* on the basis that in the latter case, the plaintiffs claimed that the defendants' misconduct caused the failure of the S & L—an injury common to all depositors—whereas in the case before it, the plaintiffs' claim was based on inducement by the misleading financial statements—an injury unique to the plaintiffs. *Id.* at 274.

Finally, the Third Circuit again addressed the scope of *In re Sunrise Sec. Litig.* in the 1992 case of *Hayes v. Gross*, 982 F.2d 104 (3d Cir.1992). In that case, the plaintiff alleged that the directors and officers of an insolvent savings association misrepresented the financial condition of the association, causing the plaintiff to purchase the association's stock at an inflated price. *Id.* at 105. The district court dismissed the plaintiff's claim based on the decision in *In re Sunrise Sec. Litig.* and on a finding that the plaintiff's claim was predicated on an injury to the association due to the defendants' mismanagement rather than on any injury unique to the plaintiff. *Id.* at 105. On appeal, the Third Circuit concluded that the complaint did in fact allege a direct injury to the plaintiff, and it therefore reversed the district court. *Id.* at 106. The court noted that had the plaintiff alleged *only* mismanagement by the defendants, the plaintiff's claim would be derivative. *Id.* However, the plaintiff additionally alleged that defendants made affirmative representations regarding the condition of the association, and this additional allegation

---

shareholders and because the fraud alleged by the plaintiffs affected all shareholders equally, the claims were derivative rather than direct. *Id.* at 1372–73. The court further held that because the shareholders' injury was caused by the demise of the corporation and not by the third party's nondisclosure, the injury was derivative and was not distinct from that suffered by the corporation. *Id.* at 1374.

6. We do not ignore the fact that Northwest has asserted multiple claims, including fraudulent inducement, consumer fraud, and negligence. Because we examine the nature of Northwest's *injuries* to determine whether they are separate and distinct from the other debenture holders, and because Northwest asserts a similar injury under each claim, Northwest's particular choice of legal theory in which to couch the claims is irrelevant for the purpose of our analysis. We therefore need not address each claim separately.

constituted an actionable claim of direct injury to the plaintiff. *Id.* Further, the court in *Hayes* distinguished the facts before it from those of *In re Sunrise Sec. Litig. Id.* at 107–108. The court noted that in the latter case, the injury to the plaintiffs was due to mismanagement and insolvency, not misrepresentation, whereas in the case before it, the injury was due to specific misrepresentations that affected a defined group of prospective purchasers. *Id.* at 108. Moreover, the plaintiffs in *In re Sunrise Sec. Litig.* did not allege an injury at the time of purchase, whereas the plaintiff in *Hayes* alleged an injury at the time of purchase in the form of an inflated price for the stock. *Id.* As a result of these distinctions, the court held that *In re Sunrise Sec. Litig.* did not govern the outcome of the *Hayes* case. *Id.*

An examination of the record in this case compels our conclusion that Northwest's claims are distinguishable from the plaintiffs' claims in *In re Sunrise Sec. Litig.* and are analogous to the plaintiffs' claims in *Univ. of Md.* and *Hayes.* For example, in *In re Sunrise Sec. Litig.,* the court held that although the plaintiffs claimed misrepresentation, the foundation of these claims was the mismanagement and resulting insolvency of the institution. 916 F.2d at 887. In the present case, on the other hand, Northwest alleges very specific incidences of misrepresentation in Touche's audit report on which Northwest directly relied. Thus, although Northwest asserts that Touche's misrepresentation of the value of the FIR to Midwest indirectly affected Northwest, Northwest also alleges specific misrepresentations in the audit report that affected Northwest directly in its decision to purchase the debentures. It is these allegations that are analogous to the misrepresentation claims asserted by the plaintiffs in *Univ. of Md.* and *Hayes,* and it is this claim of direct fraud and the resulting injury that is separate and distinct from any fraud claim belonging to Midwest and from any injury to the debenture holders generally. We therefore conclude that Northwest's claims of injury alleged to have resulted from Touche's misrepresentations are not derivative claims belonging to Midwest.

Reversed and decision of the trial court reinstated.