# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-2124/03-2126

_____

| | | |
|---|---|---|
| Popp Telecom, Inc., formerly known as LDB International Corporation; | * * * | |
| Plaintiff-Appellant, | * * | |
| Humbird Securities Company; Northern Securities Company; | * * * | |
| Plaintiffs-Appellants, | * * | |
| Washington Sharecom, Inc., | * * * | Appeals from the United States District Court for the District of Minnesota. |
| Plaintiff-Appellant, | * * | |
| v. | * | |
| American Sharecom, Inc.; Steven C. Simon; James J. Weinert; William J. King, | * * * * | |
| Defendants-Appellees. | * | |

_____

Submitted:  December 17, 2003

Filed:   February 27, 2004

_____

Before WOLLMAN, LAY, and HANSEN, Circuit Judges.

_____

LAY, Circuit Judge.

Popp Telecom, Inc., Washington Sharecom, Inc., Humbird Securities Company, and Northern Securities Company (collectively, the "Dissenters") appeal from the district court's[1] entry of summary judgment in favor of American Sharecom, Inc. (the "Corporation"), Steven C. Simon ("Simon"), James J. Weinert ("Weinert"), and William J. King ("King") (collectively, "ASI"). We affirm.

## I. Background

This case makes its second appearance before this court. A detailed account of the events in this case is provided in our prior opinion, Popp Telecom, Inc. v. American Sharecom, Inc., 210 F.3d 928, 931-34 (8th Cir. 2000). We provide an abbreviated chronology of the events here.

Simon, Weinert, and the Dissenters were shareholders of the Corporation. Simon, Weinert, and King were the President, Vice President, and Chief Financial Officer, respectively, of the Corporation and also served on its Board of Directors. On April 7, 1992, the Corporation's Board approved a "freeze-out" merger with Sharecom Holdings, Inc., a corporation owned exclusively by Simon and Weinert. To complete the merger, the Corporation had to pay all non-acquiring shareholders the fair value of their shares. Simon and Weinert received no cash proceeds but emerged as the owners of the surviving corporation. The Dissenters opposed the merger and challenged the proffered payment of $17,694.64 per share. The Corporation's shareholders approved the merger by a divided vote on May 8, 1992, and the merger became effective on that date.

Following the merger, the Corporation paid off each shareholder except the Dissenters. The Corporation then filed a petition for determination of value in

---

[1]The Honorable Joan Ericksen Lancaster, United States District Judge for the District of Minnesota, now known as the Honorable Joan N. Ericksen.

Hennepin County District Court. The Dissenters filed a counterclaim alleging the merger was invalid due to fraud, but the court dismissed the counterclaim as outside the scope of the valuation proceeding. On June 28, 1994, the court found that the Corporation's stock had been undervalued and that each share was worth $111,893. About five months after the valuation proceeding and over two years after the merger, Rochester Telephone Corporation announced that it would acquire the Corporation for about $190 million worth of Rochester Telephone stock.

On December 16, 1994, the Dissenters moved the Minnesota Court of Appeals to remand the valuation proceeding to state court for reconsideration on the basis of newly discovered evidence that ASI had defrauded the court during the proceeding. However, because a satisfaction of judgment had been entered on the valuation proceeding, the Minnesota Court of Appeals ruled that the state district court lacked jurisdiction to vacate the judgment. See Am. Sharecom, Inc. v. LDB Int'l Corp., 553 N.W.2d 433, 435 (Minn. Ct. App. 1996) ("Sharecom II"). The court noted that the Dissenters had another available remedy in the form of a separate common law fraud action. Id. at 434.

The case now on appeal had its genesis in May of 1994, when the Dissenters served, but did not file, a complaint alleging several claims against ASI, including common law fraud. No suit was filed until the Dissenters filed an amended complaint in state court on November 8, 1996, alleging seven claims.[2] ASI removed the case to federal court on December 2, 1996, and the Dissenters filed their second amended complaint.

---

[2]The seven claims were: (1) common law fraud; (2) common law fraud in the dissenters' rights proceedings; (3) unjust enrichment; (4) breach of fiduciary duty; (5) unfairly prejudicial conduct toward the Corporation's shareholders; (6) violations of the Minnesota Securities Act; and (7) a civil claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.

The district court eventually dismissed or granted summary judgment on all claims. The Dissenters appealed, and we reversed and remanded. See Popp Telecom, 210 F.3d at 944. On remand, the Dissenters filed their third amended complaint.[3] The Dissenters later brought a motion to add a claim for punitive damages under Minnesota law. This motion was granted on May 7, 2002.

Briefly stated, the Dissenters' claims are based on their belief that Simon and Weinert used a series of schemes to steal control of the Corporation. The Dissenters claim that Simon and Weinert solicited and defrauded unwitting shareholders into selling their stock at low prices to John Van Heuvelen, a longtime friend of Simon. The Dissenters assert that Van Heuvelen was a "strawman" who was actually purchasing the stock for Simon and Weinert. According to the Dissenters, the low prices in the Van Heuvelen transactions allowed Simon and Weinert to depress the value of the Corporation's stock in later tender offers.

The Dissenters also claim that Simon and Weinert misrepresented the value of the Corporation's shares in their tender offers to other shareholders; used unexercised stock options to dilute the price they told shareholders could be paid for the Corporation; made material misrepresentations in, or omitted material facts from, tender offers in order for the Corporation to redeem stock; made material misrepresentations to financial institutions; and lied under oath and concealed information from the Dissenters and the court during the valuation proceeding.

Following the close of discovery, ASI moved for summary judgment. On March 20, 2003, the district court granted ASI's motion and dismissed all claims. The Dissenters now appeal.

---

[3]The third amended complaint included the original seven claims and claims for civil liability for theft, civil liability for transfer of stolen property, civil conspiracy, and violations of the Minnesota Prevention of Consumer Fraud Act.

## II. Discussion

A. *Standard of Review*

We review the grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party. See United Fire & Cas. Ins. Co. v. Garvey, 328 F.3d 411, 412-13 (8th Cir. 2003). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment is mandated if the nonmoving party fails to establish the existence of an essential element of its case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

B. *RICO*

The Dissenters' RICO claim had not been passed upon by the district court when this court first entertained the prior appeal. However, when the first case was remanded, the district court held that the Dissenters' RICO claim was barred by the Private Securities Litigation Reform Act of 1995 ("PSLRA").[4] In making this ruling, the district court applied the framework set forth in Landgraf v. USI Film Products, 511 U.S. 244 (1994), and concluded that application of the PSLRA to the Dissenters' RICO claim would not have retroactive effect.[5] The district court was guided by the

---

[4]The PSLRA, which took effect on December 22, 1995, amended RICO to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." Pub. L. 104-67, § 107, 109 Stat. 737, 758 (Dec. 22, 1995), amending 18 U.S.C. § 1964(c). There is no dispute that the Dissenters' RICO claim is based on securities fraud.

[5]Landgraf provides that whenever a case implicates a federal statute enacted after the events in the suit, the court first must determine "whether Congress has

-5-

opinions of other courts who have addressed the issue in the context of RICO claims filed after the PSLRA's effective date based on conduct pre-dating the PSLRA. Compare Scott v. Boos, 215 F.3d 940, 945-49 (9th Cir. 2000) (holding the PSLRA has retroactive effect when applied to RICO claims filed after the PSLRA's effective date based on conduct occurring prior to the effective date) with Kolfenbach v. Mansour, 36 F. Supp. 2d 1351, 1353-54 (S.D. Fla. 1999) (holding, on nearly identical facts, that application of the PSLRA did not have retroactive effect). Relying on the reasoning in Kolfenbach, the district court held that the Dissenters' right to assert their RICO claim expired on the PSLRA's effective date.

Although we agree with the district court's conclusion that the PSLRA bars the Dissenters' RICO claim, we hold that our prior decision in Professional Management Associates, Inc. Employees' Profit Sharing Plan v. KPMG, LLP, 335 F.3d 800 (8th Cir. 2003), cert. denied, 72 U.S.L.W. 3422 (U.S. Jan. 26, 2004) (No. 03-864) (hereinafter "PMA"), is dispositive of the Dissenters' RICO claim. Therefore, we affirm the district court's grant of summary judgment on this claim, but we do so for reasons different from those articulated by the district court.

In PMA, we held that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") applied to and barred "all actions commenced after its enactment, even if the challenged conduct predate[d] SLUSA." Id. at 804. SLUSA, which was enacted on November 3, 1998, provides for removal to federal court and dismissal of certain class actions brought under state law by any private party alleging "an untrue

---

expressly prescribed the statute's proper reach." 511 U.S. at 280. If Congress has not done so, "the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id. If the statute is found to have retroactive effect, it "does not govern absent clear congressional intent favoring such a result." Id.

statement or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b)(1). The conduct at issue in PMA occurred between 1994 and 1997, but the class action lawsuit was not filed in state court until three years after SLUSA's enactment. PMA, 335 F.3d at 803. The district court concluded that the complaint filed in the case implicitly alleged misrepresentations and omissions in connection with the purchase of a covered security and dismissed the case under SLUSA. Id. at 802.

On appeal, the plaintiffs claimed the district court erred in applying SLUSA retroactively to the pre-enactment conduct. Id. at 803. In affirming the district court, this court concluded that no retroactivity analysis was needed because SLUSA merely established "a procedural rule regarding the filing of class action lawsuits alleging securities fraud." Id. at 803-04. Relying on Landgraf, we pointed out that, generally, there is no retroactivity concern when a new procedural rule becomes effective after a cause of action accrues but before the filing of a lawsuit because procedural rules regulate secondary conduct rather than primary conduct. Id. at 803. Because SLUSA regulated only "secondary conduct, the filing of the lawsuit, not the primary, allegedly illegal pre-enactment conduct[,]" we held that SLUSA applied to all actions commenced after its enactment, even if the conduct occurred before enactment. Id. at 803-04.

There are several similarities between PMA and the instant case. First, the allegedly illegal conduct giving rise to the Dissenters' RICO claim occurred prior to the PSLRA's effective date, but the Dissenters did not amend their complaint to add the RICO claim until after the PSLRA's enactment. Second, SLUSA and the PSLRA both eliminate causes of action. SLUSA eliminates state law securities class actions, and the PSLRA eliminates securities-based RICO claims. Third, neither SLUSA nor the PSLRA eliminate a party's right to pursue other claims. A party who previously could have brought a state law securities class action may bring a class action in federal court under federal law or may pursue his state law claims in state court in an

individual action.  See Winne v. Equitable Life Assurance Soc'y of the U.S., No. 03 Civ. 1689, 2003 WL 22434215, at *9 (S.D.N.Y. Oct. 27, 2003).  Similarly, a party who previously could have brought a RICO claim for securities fraud may still pursue a claim under federal securities laws.  See Mathews v. Kidder, Peabody & Co., 161 F.3d 156, 164 (3d Cir. 1998).  Finally, neither SLUSA nor the PSLRA regulate the underlying, allegedly illegal conduct.  Like SLUSA, the only relevant conduct regulated by the PSLRA is the filing of a RICO claim.

Based on the foregoing analysis, we conclude the PSLRA, like SLUSA, is merely a procedural rule regulating the filing of a RICO claim.[6]  We therefore hold that the PSLRA applies to all securities-based RICO claims commenced after its effective date even if such claims are based on conduct which predates the PSLRA. Accordingly, the Dissenters' RICO claim is barred unless it was pending on the date of the PSLRA's enactment.  The Dissenters insist their claim falls within this exception.

On appeal, the Dissenters argue the district court should have applied the relation-back doctrine of Fed. R. Civ. P. 15(c)(2)[7] to save their RICO claim.

---

[6]We are not persuaded by the Dissenters' argument that the PSLRA is more than a procedural rule because it affects the substantive rights of a party by eliminating the right to obtain treble damages under RICO.  See Mathews, 161 F.3d at 165 (stating "a change from treble damages (under RICO) to compensatory damages alone (under the securities laws) may be seen as *destroying* a cause of action and impairing a party's rights") (emphasis in original).  The plaintiffs in PMA could be said to have lost the substantive right to bring a state law class action securities claim and the right to recover damages under such a claim.  However, in PMA, we held that SLUSA was merely a procedural rule.  We see no difference here.

[7]Rule 15(c)(2) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading[.]"

Although the events giving rise to the Dissenters' RICO claim arose by June of 1994, the Dissenters did not amend their original complaint to add the RICO claim until November 8, 1996, almost one year after the PSLRA took effect. Despite their apparent tardiness, the Dissenters argue their RICO claim relates back to their original pleading. Therefore, the Dissenters contend, their RICO claim is preserved because their lawsuit was pending at the time of the PSLRA's enactment. See Mathews, 161 F.3d at 171 (holding that the PSLRA does not apply to securities-based RICO claims pending on the date of its enactment).

The district court's application of Rule 15(c) is reviewed for an abuse of discretion. See Mandacina v. United States, 328 F.3d 995, 1000 (8th Cir. 2003). Generally, courts apply the relation-back doctrine with reference to statutes of limitations, but it has been applied in other contexts. See Alpern v. UntiliCorp United, Inc., 84 F.3d 1525, 1543 (8th Cir. 1996). However, we are not aware of any cases in which the doctrine has been applied to save a RICO claim first asserted after the PSLRA's enactment. The district court concluded application of the doctrine was not warranted because the Dissenters had no right to expect that their RICO claim would survive any change in the law merely because the conduct underlying the claim had already occurred. See ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F. Supp. 1308, 1320 (S.D.N.Y. 1997) ("[I]t has long been recognized that 'no person has a vested right in any general rule of law or policy of legislation entitling him to insist that it remain unchanged for his benefit.'") (quoting Chicago & Alton R.R. v. Tranbarger, 238 U.S. 67, 76 (1915)). We find no error in the district court's reasoning.[8]

_____

[8]Even if we disagreed with the district court's reasoning, application of the doctrine still would have been inappropriate in this case. Under Rule 15(c), an amendment relates back to the original pleading only if the claim asserted in the amended pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). "The rationale of Rule 15(c) is that a party who has been notified of litigation concerning

In summary, because the Dissenters filed their RICO claim after the PSLRA's effective date, the district court did not err in granting summary judgment in favor of ASI on this claim.

### C.  *Common Law Fraud*

The district court granted summary judgment in favor of ASI on the Dissenters' common law fraud claims[9] because the Dissenters failed to establish detrimental reliance and lacked standing.  On appeal, the Dissenters argue they are entitled to pursue their claims based on the law of the case doctrine or, in the alternative, because they state cognizable claims for common law fraud.  We are not persuaded by either argument.

"The law of the case doctrine prevents the relitigation of a settled issue in a case and requires courts to adhere to decisions made in earlier proceedings."  <u>Kan.</u>

---

a particular occurrence has been given all the notice that statutes of limitations were intended to provide."  <u>Mandacina</u>, 328 F.3d at 1000 (citation omitted).  The Dissenters' amended complaint added over fifteen pages of new facts that were not alleged in the original complaint, including the Van Heuvelen "strawman" transactions.  Under these circumstances, we do not believe the original complaint provided sufficient notice to ASI of any RICO claim.  <u>See</u> <u>Shea v. Esensten</u>, 208 F.3d 712, 720 (8th Cir. 2000); <u>McGregor v. La. State Univ. Bd. of Supervisors</u>, 3 F.3d 850, 864 (5th Cir. 1993).  Therefore, the district court did not abuse its discretion in refusing to apply Rule 15(c) to the Dissenters' RICO claim.

[9]The Dissenters pled one cause of action based on common law fraud and another based on common law fraud in the dissenters' rights proceedings.  However, the record reveals that the Dissenters' claims are based on one fraudulent scheme through which ASI effectuated the merger and procured the valuation order.  The premise of the fraud claims is that, absent the fraud, other shareholders would not have sold their shares, the freeze-out merger would not have occurred, the Dissenters would have retained their shares, and the valuation order would not have been entered.

-10-

Pub. Employees Ret. Sys. v. Blackwell, Sanders, Matheny, Weary & Lombardi, L.C., 114 F.3d 679, 687 (8th Cir. 1997). Contrary to the Dissenters' assertion, neither our opinion in Popp Telecom, 210 F.3d 928, nor that of the Minnesota Court of Appeals in Sharecom II, 553 N.W.2d 433, decided that the Dissenters had established the requisite elements of a common law fraud claim. These opinions recognized only the Dissenters' right *to bring* a common law fraud claim, but they never reached or assessed the merits of that claim. See Popp Telecom, 210 F.3d at 939; Sharecom II, 553 N.W.2d at 434.[10]

---

[10]The Dissenters also suggest the district court effectively recognized their right to pursue the common law fraud claims by granting the Dissenters' request to plead punitive damages. However, the standard for granting a motion to amend to claim punitive damages is not the same as the standard for surviving a motion for summary judgment. Under Minnesota law, a plaintiff may not seek punitive damages in an initial complaint but must do so by making a motion to amend the pleadings. Minn. Stat. § 549.191 (2002). A punitive damages amendment is allowed "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Id. § 549.20, subd. 1(a). A plaintiff seeking a punitive damages amendment need not demonstrate an entitlement to such damages *per se* "but only an entitlement to allege such damages." Ulrich v. City of Crosby, 848 F. Supp. 861, 867 (D. Minn. 1994). The magistrate judge who granted the Dissenters' motion to amend recognized that granting the motion did not secure the right to a trial on the common law fraud claims, stating, "[w]hether or not [the Dissenters' fraud] claim is strong enough to survive a motion for summary judgment or to prove successful at trial are determinations for other proceedings."

While the Dissenters may have met the standard for pleading punitive damages under Minnesota law, to survive summary judgment, they must establish the essential elements of their common law fraud claims. See Celotex, 477 U.S. at 322. As discussed in this opinion, the Dissenters cannot meet this standard. Thus, we see no conflict between the district court's order granting the Dissenters' motion to amend to claim punitive damages and its grant of summary judgment on the common law fraud claims.

-11-

The Dissenters also contend they state cognizable common law fraud claims. In order to maintain a common law fraud claim under Minnesota law, a plaintiff must prove: (1) a false representation of material fact that is susceptible of knowledge; (2) made with knowledge that it is false or asserted as if it is based on the person's own knowledge without knowing whether it is true or false; (3) made with the intent to induce another to act in reliance on the representation; and (4) causing the other party to act in reliance to its detriment. See Sharecom II, 553 N.W.2d at 434; Davis v. Re-Trac Mfg. Corp., 149 N.W.2d 37, 38-39 (Minn. 1967). Detrimental reliance is an essential element of a common law fraud claim, and failure to establish detrimental reliance dooms a claim for common law fraud. See Breezy Point Airport, Inc. v. First Fed. Sav. & Loan Ass'n of Brainerd, 179 N.W.2d 612, 615 (Minn. 1970) ("It is elementary that absent the essential element of reliance, an action for fraud must fail."); Nilsen v. Farmers' State Bank of Van Hook, N.D., 228 N.W. 152, 153 (Minn. 1929) (holding that a plaintiff must show reliance upon false representations to recover).

The Dissenters allege numerous fraudulent activities by Simon and Weinert designed to induce the Corporation's shareholders to sell their shares. However, the Dissenters were not induced to sell their shares by any of the alleged fraudulent activities of Simon and Weinert, a fact they admit. The Dissenters took no action in reliance on any omissions or misrepresentations of material fact by Simon and Weinert prior to the merger. While the evidence supports the allegation that ASI engaged in fraudulent conduct to convince shareholders to sell their shares, the Dissenters never sold their shares. The Dissenters' lack of reliance is further evidenced by their vote against the proposed merger with Sharecom. The Dissenters had no control beyond that vote and eventually were paid fair value for their shares as determined by a judge.[11]

---

[11]We note that the Dissenters are not challenging the amount they received for their shares based on the valuation order. The Dissenters' claim for damages is based

We conclude the Dissenters cannot establish detrimental reliance, an essential element of their common law fraud claims. Accordingly, we hold that summary judgment in favor of ASI was appropriately granted on these claims.

D.    *Other Claims*

1.  Unjust Enrichment

We find no error in the district court's grant of summary judgment in favor of ASI on this claim. In the present case, ASI obtained the Dissenters' stock through the merger and paid the judicially determined fair value in return. Because ASI paid for what it received, the Dissenters cannot establish an unjust enrichment claim under Minnesota law. See ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 NW.2d 302, 306 (Minn. 1996).

2.  Breach of Fiduciary Duty and Unfairly Prejudicial Conduct

The district court properly dismissed the Dissenters' breach of fiduciary duty and unfairly prejudicial conduct claims because they are derivative claims belonging to the Corporation. A shareholder asserting a cause of action belonging to the corporation must seek redress "in a 'derivative' action on behalf of the corporation rather than in a direct action by the individual shareholder." Northwest Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche, 535 N.W.2d 612, 617 (Minn. 1995). The relevant inquiry for determining whether a claim is direct or derivative is "whether the injury to the individual plaintiff is separate and distinct from the

on the fact that the freeze-out merger prevented them from realizing any benefit from the sale of the Corporation to Rochester Telecom over two years after the merger. We also note that the Rochester Telecom transaction should have had no bearing on the state court's fair value determination, as the Corporation's shares were being valued as of May 8, 1992, not December of 1994.

-13-

injury to other persons in a similar situation as the plaintiff." Id. If the injury is not separate and distinct, only a derivative action is available. See id. Because any injury the Dissenters suffered as a result of Simon and Weinert's alleged breaches of fiduciary duty is not separate and distinct from the injury to other minority shareholders, their breach of fiduciary duty claim is derivative. Further, the Dissenters' unfairly prejudicial conduct claim is based on allegations that the actions of Simon, Weinert, and King constituted waste and misappropriation of corporate assets. However, waste and misappropriation of corporate assets "are traditional derivative claims that rightfully belong to the corporation." Wessin v. Archives Corp., 592 N.W.2d 460, 465 (Minn. 1999).

### 3. The Minnesota Securities Act

In order to state a claim under the Minnesota Securities Act, Minn. Stat. § 80A.01, a plaintiff "must allege a misstatement or omission in connection with his own decision to purchase or sell a security." Davis v. Midwest Disc. Sec., Inc., 439 N.W.2d 383, 388 (Minn. Ct. App. 1989). Humbird Securities Company and Northern Securities Company argue on appeal that because they exchanged their stock for value, there was a sale under § 80A.01. However, there is no connection in this case between any alleged fraud or misrepresentation by ASI and some *decision* by the Dissenters to sell their stock. Rather than deciding to sell their stock, the Dissenters were forced to sell. Although the Dissenters objected to the freeze-out merger, the merger eliminated the Dissenters' ability to make a decision regarding the sale of the stock. As a result, § 80A.01 does not apply and the district court correctly granted summary judgment.

### 4. Consumer Fraud Act

The district court held that the Dissenters could not maintain their claim under the Minnesota Prevention of Consumer Fraud Act ("CFA"), Minn. Stat. §§ 325F.68-

325F.70, because they were sellers in this case, and the CFA only protects consumers. On appeal, the Dissenters argue that the CFA is not expressly limited to consumers and applies to any fraud in connection with the sale of merchandise whether such fraud involves the buyer or the seller. We are not persuaded by the Dissenters' argument. Although the CFA should be construed broadly to enhance consumer protection, see Ly v. Nystrom, 615 N.W.2d 302, 308 (Minn. 2000), the Dissenters cite no Minnesota case which has applied the CFA to allow the seller to bring a claim alleging fraud on the part of the consumer. The cases cited by the Dissenters are clearly distinguishable.[12]  Accordingly, we hold the Dissenters were not consumers protected by the CFA and the district court properly granted summary judgment in favor of ASI on this claim.

## 5.  Civil Liability for Theft and Transfer of Stolen Property

The district court concluded there was no stolen property to support these claims because the Dissenters had no choice but to surrender their shares in the freeze-out merger. We agree. The Dissenters argue that ASI's fraudulent conduct in tricking other shareholders into selling their shares, which eventually allowed ASI to obtain the Dissenters' shares in the freeze-out merger, meets the requirements for theft under Minnesota law. See Minn. Stat. § 609.52, subd. 2(4) (defining theft to include obtaining property or services from another person "by swindling"). However, no theft occurred in this case because the Dissenters sold their shares pursuant to a court-supervised merger. In addition, the Dissenters cannot claim they were swindled out of their shares because they never relied on any of ASI's

---

[12]The Dissenters' reliance on Group Health Plan, Inc. v. Philip Morris, Inc., 621 N.W.2d 2 (Minn. 2001), to support their argument that the CFA protects sellers is misplaced. Although the Minnesota Supreme Court held that a plaintiff need not be a purchaser of the defendant's products in order to properly plead a claim under the CFA, id. at 11, the case involved plaintiffs who were, in effect, indirect consumers of the defendant's products, not sellers. Id. at 4-5.

misrepresentations prior to the merger. In this case, the Dissenters never sold their shares in reliance on any fraudulent representations by ASI. Instead, as we have previously stated, the Dissenters were forced to sell their shares in the freeze-out merger. We conclude the district court did not err in granting summary judgment in favor of ASI on these claims.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

_____